May 30, 2011 Board of Trustees Meeting, Page 17 Council, we have received a copy from the Justice Department of the Board's decision of a couple of weeks ago. This was May 30th, Your Honor. Yes, May 30th, sustaining the appeal from the removal order. Where does this leave us? Well, one of the ---- let me introduce myself. May it please the Court. My name is Alan Hutchison. This is my first appearance before the Ninth Circuit. It's a great honor to be here. We have two basic issues in this case, Your Honor. The major one is collateral estoppel. And this case came up, was published on the 30th of May. I got it just a few days ago. And to my great surprise, the Board of Immigration Appeals accepted the doctrine of collateral estoppel, where an alien had in a 1326 criminal proceeding established that he was a U.S. citizen. And therefore, not eligible. And they accepted that and said that eliminates all of his immigration consequences. He's a U.S. citizen under the doctrine of collateral estoppel. And that's something we want to discuss in this case. Because in this case, we have a simple situation where Garcia was charged with reentry in the United States after having been deported for a criminal offense. He was tried in district, U.S. District Court in Nevada under 8 U.S.C. section 1326 for reentry. Judge Reed tried the case, senior judge, and decided that Garcia could collaterally attack his prior deportation order if he could show it was incorrect and he had been prejudiced by it. We had submitted to Judge Reed a BIA case that was very similar called the matter of Picado, where Picado in New York State was convicted of carrying a concealed weapon, where the concealed weapon, in fact, was a handgun. The BIA decided that this was not a deportable firearms offense because the only conviction was a conviction for a concealed weapon. Judge Reed thought that was important, and he proceeded to do a very detailed U.S. v. Taylor analysis on the case and asked the question, is possession of a firearm an essential element of the crime of carrying a concealed weapon? Now, Garcia was originally convicted under a Washoe County ordinance for carrying a concealed weapon. And the judge concluded, no, a concealed weapon can be a pair of brass knuckles or a blackjack or what have you. And then he asked if he was prejudiced, and he said, yes, he was clearly prejudiced. And then he looked into the immigration court proceedings and found that the immigration judge at the detention center in Eloy, Arizona, you know, failed to advise Garcia that he had any defenses available. Certainly, it was not a deportable firearms offense. There was a question whether he had a 212C-H defense. He did not advise him that he could take an appeal. And Judge Reed decided this was a denial of due process of law. And on the basis that the original conviction was not a deportable offense, he dismissed the indictment under 1326 and said the defendants, I don't want to, I, I, okay, but that, and you're saying that that ought to be followed, but should have been followed by the judge. Yes, yes, and. And I take it your position is that this case is authority for the proposition that the BIA does treat such determinations as binding on the government. And so, therefore, it ought to follow its own authority here? Yes. I'm jumping ahead, Your Honor, because when we got to the BIA, they denied that collateral estoppel denied here. And we might as well take that, because they cited a number of cases which were cited by the government, Helmering v. Mitchell, and an assortment of 183 firearms. They said, well, it's you cannot apply collateral estoppel if you, since you have different standards of evidence in the criminal proceeding, which is 1326, and in the civil proceeding, which is a deportation proceeding. Now, I quite agree with that proposition, but when you look at those two cases, and they're both U.S. Supreme Court cases, Helmering was a commissioner of internal revenue, and they had charged Mitchell with tax evasion, criminal tax evasion, and he was acquitted. But they then went ahead and fined him for the taxes that were owed. So clearly, there are different standards of evidence. And the same thing on 183 firearms. There, the defendant was charged with dealing in firearms without a proper license, which is a criminal offense. He was acquitted. But then they charged him with the forfeiture of the firearms, which is a civil offense. But here, we have a legal question. Was conviction for carrying a concealed weapon a firearms offense? And it clearly is not. And so we think the Board of Immigration Appeals is bound under collateral estoppel. Now, this question came up because Garcia was detained by Immigration and Customs Enforcement right in the district court, was sent to the sheriff's jail in Yuba City, California. So Garcia filed a petition for writ of habeas corpus in the Eastern District of California. That writ was decided 13 months later with a recommendation by a Federal magistrate saying clearly the doctrine of collateral estoppel applies in this case. The district court in Nevada made a detailed analysis. This was not a deportable offense. The Petitioner's due process rights were violated, and the magistrate recommended to the court that they grant the writ. At that time, the REAL-ID Act was passed, which transferred all jurisdiction on writs of habeas corpus brought by aliens to the appropriate court of appeals. And a district judge, a senior judge of the Eastern District, forwarded this writ to this court with a recommendation that Garcia had a very plausible case, and that the writ should be granted by this court. And I certainly urge the court to grant the writ, because that would restore Garcia to his original status as a legal permanent resident. Roberts. But I have a problem here with and is that is that so so we have a subsequent deportation that was initiated later on, right? Yes. Yes. And that's the one that concerns me, because here the BIA decided that, even assuming that the district court correctly determined that the Respondent's 96 deportation order based on criminal charges was invalid, the Respondent was ordered deported on two other occasions which provide a solid basis for the current charge of removability, and then they uphold the removal based on that. Well, basically, they brought a third action, and that's the 06 Petition. Right. Because at the time these briefs were filed, the case of Morales-Esquieta had been decided by a three-judge panel which stated that the court decided only immigration judge. I understand. That's why they did it. So they said, oh, fine, you entered without inspection, and that's a deportable offense. Right. Now, Judge Reed covered that in his district court proceeding. He said, of course, this is not a defense against entering without inspection. And that is a violation of 8 U.S. Code 1325, and it's a misdemeanor. It's a $50, $250 fine worth 30 to 60 days in jail. No. I'm talking about removability, though, under the immigration laws, not the criminal laws here. My understanding is that the charge of removability under Section 212A9A2 was head as its foundation, the fact that he had been ordered deported on two other occasions and had came back into the country impermissibly, without inspection, I guess. And, therefore, you know, he would be wholly independently of the original case of the firearms. He had violated the immigration laws on two separate occasions by coming into the country and was deportable on that basis, too. Well, Your Honor, I think you can argue that since Garcia was a legal permanent resident, came in in 1984, when he was about 8 years old, as a legal permanent resident, if he was unjustly deported the first time and he did not lose his status as a legal permanent resident, then coming back without inspection does not mean he will lose his legal permanent residency. It does mean that he violated 8 U.S.C. 1325 by entering without inspection. It could even be argued that a U.S. citizen who crosses a border without inspection might be guilty of that crime as well. So what is the relief you're seeking here? Well, one, we would like to have this case sent back to have them consider in the new, in the subsequent deportation proceeding, the one that was started afterwards, reconsider their ruling on the collateral estoppel point and how that might affect that proceeding. Well, there's a possibility, Your Honor. But I certainly think if the Court grants the writ of habeas corpus, that restores Garcia to his status as a legal permanent resident under his U.S. citizen's stepfather, that he never lost it. I think the Court was definitely incorrect in claiming collateral estoppel did not apply in this case. And then we have the situation that we might think about it. Your argument is that if the BIA has reached a determination as to how they're going to apply collateral estoppel, that gets deference from us. I mean, we might have reservations about whether collateral estoppel should be applied in the circumstances that the, that the BIA has found collateral estoppel to apply. But your position, I presume, would be that that's not for us to decide independently. If the BIA wants to set up their own rules of how collateral estoppel should apply, that's, that's their business. Well, I think the Court can certainly decide that collateral estoppel applies here because we have to. We have to, though. My question is, don't we want to – would you want us to just simply defer to the decision of the BIA? No. I would prefer to this Court to make a decision. I think it's a very important case. And we have a recommendation from the Federal Magistrate and a district judge in the Eastern District of California. The BIA just issued a decision in May saying collateral estoppel applies. But not in this case. No. Yes, but the – Oh, I see. I'm sorry. I'm sorry. We've confused the two cases. Yes. I mean, it certainly adds strength to the case. It's a different situation. What the BIA will do, I never know. Well, it's a different situation because there the Court had determined alienage. In your – the issue of alienage, your collateral estoppel point goes to what particular firearms offense he had been convicted of? Is that the case? Well, Your Honor, I've had the case where I proved U.S. citizenship in a district court, 1326, and I was subsequently denied a certificate of citizenship and went all the way to the Administrative Appeals and said, no, there was insufficient evidence. So I think this case is very important. Well, now, when you ask us to decide out of whole cloth whether collateral estoppel applies, as opposed to just saying, well, the BIA has decided that. We'll accept it as the standard. You run the risk that we might conclude otherwise, do you not? Well, that's true, Your Honor, and I leave that to the Court. Well, you might – you're – you're posing some risk to your client, are you not, by saying you want the Ninth Circuit decided as opposed to just accepting their decision and go on from there, right? You're willing – you want to take that risk? Well, this case has been going on for over four years, Your Honor. We have three separate petitions for review. I think we have a very serious question of justice. We have some very serious legal questions, and I think it's quite appropriate for this honorable court to make that decision, and I'm quite willing to accept that. Okay. Okay. Any further questions? No. All right. I'll reserve the balance of my time. Thank you. Good morning. Kate DeAngelis for the Attorney General. I'll start by saying, as the Court has already noted, the dispositive issue in this case is that there was a 2004 NTA Petitioner conceded the factual allegations that he reentered illegally on more than one occasion. In fact, it seems that he's reentered several times illegally. If he can reestablish that he was a lawful permanent resident at the time of those entries, then can't he attack that, those determinations by the I.J. on that basis? Well, there are several problems with that. First of all, as the Board noted, the motion to reopen was untimely. And he faces a very high burden in getting the case reopened for what he wants the Court to hear. And part of it, he would have to show – essentially, he would have to show a gross miscarriage of justice. Right. Which it's pretty clear that he wouldn't be able to show here, considering that he's – And the burden shifts to him, does it not, to show the effect of what happened? Exactly, yes. He's got to, in effect – my understanding is that on the collateral estoppel point, instead of just following whatever was decided by the district court, under the procedural posture of the case as it's now presented is, he has an affirmative duty to prove that there wasn't a – an unlawful criminal act here. That's correct. Rather than – rather than just simply accepting what was decided, he – the burden is on him. That's correct. And that's a very high burden for him to meet in this case, considering that he has admitted in several different instances that the weapon at issue was a gun. So it seems that there – you know, there clearly was not an abuse of discretion in the board denying the motion to reopen in this case. And so then we're back to grappling with this 2004 NTA, in which he makes no affirmative argument in his brief to this Court that he did not, in fact, enter – reenter illegally. And this Court has held on several occasions that even if an underlying or a previous order of deportation was invalid or even vacated, that that does not entitle an alien to this type of self-help, that is to say, to reenter illegally, and then years later, after sleeping on his rights, try and go through these motions to open up an earlier, you know, removal order where it didn't become a court. I mean, it's a general principle that if there's an order out there, you must obey it. And if you want to attack it, that's fine. You follow the procedures to attack it. But you have no right to disobey the order. That's right. And there were several procedures that could have been followed for Mr. Garcia to have a new consideration of his 1994 or 1996, excuse me, removal order. He could have, you know, tried to go to the consulate and get a waiver of inadmissibility and come back to the United States and reopen his case properly. He, you know, if that didn't work, he could have presented himself at the border and said, you know, could you please put me into proceedings? I want to, you know, be a foreign immigration judge to talk about this 1996 order. But he did none of those things. And, in fact, he admits in the briefs that he did reenter illegally and that he did so to reunite with his family, which certainly does not excuse the charges in the NTA. So the government would argue that the whole issue that Petitioner raises here, the 1996 deportation, does not even need to be addressed. It's simply irrelevant considering the 2004 NTA. We've laid out our arguments about the 1996 deportation order in the brief. If there are any questions by the Court, I could go into those. But we feel that it's pretty well established that the 2004 NTA governs this case. If there are any questions. Well, now, the we have should we start out with a proposition that the what is it, 1996 deportation order is invalid? We should start with that, should we not? Well, I believe Petitioner would have Because of the Board's ruling in the other case. Well, the Board's, first of all, you mean the case that was presented today? Yes. Well, first of all, I mean, I really can't. I just got it this morning as well. And it doesn't appear to be a published decision. It doesn't appear to deal with similar issues. As Judge Schroeder noted previously, it's about an alienage issue. Yeah. This is a totally different issue. I would have to, you know, look into the factual background of this case in order to compare how, you know, how was alienage conceded or I just don't have the information to rely on this unpublished, non-presidential Board decision at this time. Well, what the Board in that case appeared to say that we're bound by a court's determination that it wasn't an alien. Now, what we have in this case, as I understand it, is a district court's determination that the crime that he was convicted of was what, not a deportable offense? Well, I guess what happened in the criminal proceedings was that the government did not meet its higher burden beyond a reasonable doubt of showing that there was, in fact, a gun involved in this crime. A gun, right. Now, the much lower burden in immigration court, clear and convincing evidence, you know, as I mentioned before, you can't use the criminal burden to satisfy the lower burden. And Petitioner admitted that there was a gun involved in several cases in the, you know, in the OSC, in his brief. The IJ notes that in the Eloy proceeding, the Petitioner admitted that it was a gun. So, you know, it just doesn't make sense to apply that the government didn't show it to the case here when it's pretty clear that it's been admitted that there was a gun involved and that there was no problem and, therefore, there would have been no. What he did actually is that he got off essentially on a technicality in the sense that there wasn't by the concealed weapon had not been defined in the charging instrument as a gun, that when he actually pled. But that there was a gun in the picture, he admitted, and if you flip it over now and you're looking at it from the perspective of a person who's trying to utilize guns on a motion to reopen, is trying to show that somehow he's benefitted by what happened in the district court, that he's still got the burden now of showing a gross miscarriage of justice, which means that the burden is on him to show it wasn't a gun. Exactly. That's right. And that's almost an insurmountable burden here. And, in fact, in the OSC, which is in the record at 197 — I'm sorry. That's not the proper — that's not the OSC. That's the NTA. It's at 413. The charge is described as carrying a concealed weapon and gun in parentheses that he admitted to. So, you know, I'm not sure what — how the charge was presented in the criminal case, but in the immigration case, he appears that he admitted that even that the charge was having to do with a gun. So, yeah. And so that, you know, that would just go back to my argument that he can't demonstrate a gross miscarriage of justice, which is really sort of the last line that he has here to get the case reopened, because it's untimely, and, you know, he hasn't met his burden of proving, like you said, that affirmatively that a gun was not involved, and that he wouldn't be able to do that, considering his admissions. Right. And then — and over and above that, and I'm kind of going through this so that your opposing counsel will have in mind what he may want to respond to. Over and above that, he's now — those — the order that was subsequently invalidated, if you will, by the — by the district court was in existence. And he kept trying to come back in. Right. Without attacking it. In violation of the INA on the separate 212 provisions that he was charged with. Right. In the NTA, which, again, he doesn't dispute the facts of. So it's not clear how he would, you know, get rid of that — that removal order. Okay. Okay. Any further questions? Well, I want to be — now, sometimes I think I understand this case, and then I get to thinking about it, and I'm not so sure. So bear with me here. In the new proceeding, the new deportation proceeding — The 2004? The 2004. If that is a valid proceeding, doesn't that render moot all the other issues? Right. That's exactly what we're arguing. And so if we focus on that, and if we decide that that is a lawful final order, we don't have to touch anything else. Right. Yeah. And in deciding that issue, your argument is that it doesn't matter whether the 96th order of deportation is valid. It doesn't matter. All that matters is the fact that it was entered. Right. For the purposes of the 2004 NTA, he was there at the time that he got removed. Exactly. And that's what the charge was based on. Had not been declared invalid at that — at the time that he came in. Right. Right. And if we decide that that one, for some reason, is flawed, then we have to go back to the issues of collateral estoppel. If we decide that — if you decide that the — That there's something — that there's something wrong with the 04 proceeding. Okay. Then we have to — then the government falls back on the other stuff, right? That's one way of looking at it, anyway. Right. Right. But Petitioner hasn't made any argument in his brief to this Court that there was anything wrong, aside from the 1996 deportation. He hasn't argued affirmatively that there's any problem with the allegation that he did come back. Yeah. And your — and what — what your — your argument — what saves the 04 proceeding is the fact that it doesn't matter whether the other one is valid. Right. Because he was ordered — I think I understand now for the time being. Thank you. That's helpful. All right. Okay. If there are no further questions, thank you. Can I please the Court? When you go back to the 1996 deportation, the district judge found that the immigration judge in Eloy violated Garcia's due process rights. Yeah. There's no question about that. Okay. Now we get to the question that was there a gun involved. There's no question there was a handgun involved. Garcia admitted there was a handgun involved. The controlling case in matter of Picardo, Picardo admitted there was a gun involved. And I just would like to read very briefly from Judge Reed's — Well, we get the picture, I think, on that. The problem is that he was accused of possessing a weapon, but they didn't — nobody said what kind of a weapon it was in the — in the conviction, right? In the final conviction, yes. And so we're okay on that. All right. Because Judge Reed said that, in analyzing from the standpoint of the Federal district court, it does not appear to the court that the testimony of defendant can change the nature of the conviction. And that was the case in the BIA case of matter of Picardo. All right. And then the question of untimeliness. If there's been a gross miscarriage of justice, the — the immigration court of the BIA can accept a motion that is outside the 90-day limit. And the question is, what is a gross miscarriage of justice? And I maintain, since a Federal district judge ruled that Garcia was denied his constitutional right to due process of law in his original hearing, that that in itself is a gross miscarriage of justice. Okay. Let's — let's assume that that — you're right on all of that. But now we're looking at the 2004 immigration proceeding, and it's based upon his re-entry into the country at — at a time when he was subject to an order of deportation on two separate occasions. You will argue that that — that the subsequent finding that that — that the premise for those deportation orders should be invalidated is — is — is — should be taken into account. But that clearly can't be right. It can't be right because a person is not permitted to violate an injunction while the case is pending on appeal. And when — and when the — and notwithstanding the fact that on appeal, the injunction may be overturned. You simply have an order of a court that you're not to violate, and he comes in and violates it. Later on, it may be — it may be that it was invalid. But that doesn't give the person authority to come into the country to violate an order in the hopes that maybe someday the order will be — be overturned. You follow me? I — I quite agree with you, but what he did was enter it without inspection. Your Honor, what I — Well, he was also subject to a deportation order that was extant at the time. It had not been declared invalid when he — at that time. That's true. It — this reminds me of a situation of an innocent man who's convicted of a serious crime, sentenced to the penitentiary, escapes from the penitentiary, later establishes his innocence, is acquitted of the crime, but then charged with the crime of escaping from the penitentiary. Right. Now, if it was a State matter, the — the Governor would probably give him a pardon. And this is the question before this Court. I believe he was merely guilty of entering without inspection. And if he is restored to his previous immigration status of legal permanent resident, that that takes care of that. It may be, but we're — we — it's — I don't think it's the function of an appellate court reviewing an agency — agency determinations to swoop in like some sort of a deity and — and — and, quote, do justice. Our job is to see — is to review what happened in the — in the agencies to see whether or not their rules were — were followed and — and there was — discretion was abused. And it seems to me that what's happened here is that the agency has determined that notwithstanding the prior — the — what went on in the district court and the prior — and the subsequent invalidation of this particular order, that on two separate occasions, while there was an extant order of deportation, the Petitioner came into the country in violation of the immigration laws, and that that itself is a — is a basis for removability. But, Your Honor, the government did not charge him on those two previous ones. They charged him for re-entering without inspection back — that's the 06 case. They didn't bring back the former ones, because we were demanding our day in court. But how do you — you know, obviously, we're wrestling with this, you know, rather convoluted, reticulated record here. But there is a decision by the BIA that I referred to earlier on October 12th, 2006, in which the BIA says, even assuming that the district court to correctly determine that the deportation order was invalid, the Respondent was ordered deported on two other occasions which provide a solid basis for the current charge of removability. Well, that's true, Your Honor. But in that case, you would never achieve justice because, clearly, he should not have been deported in the first place. We're talking about an 18-year-old when he was deported. Well, maybe he shouldn't have been deported in the first place, but once he was, maybe he shouldn't have been coming back in violation of an order. Well, I can't argue against that, Your Honor, because he did come back to be with his family. Yeah. Can you help me for a moment? The due process violation in connection with the original hearing was what? He wasn't advised of? Well, basically, the immigration judge in Eloy never advised Garcia of any forms of relief that were available to him. Of the other forms. And secondly, he did not advise him he had a right to appeal.  So I think that's a clear violation. Okay. Thank you. Thank you. Thank you very much, Your Honor. The case just argued is submitted for decision. We'll hear the last case on the calendar, Rios v. Reno.
judges: Schroeder, Leavy, Walker